## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

|  |  |
|---|---|
| CLEVELAND HOLT,<br><br>      Plaintiff,<br><br>  vs.<br><br>UNITED NETWORK FOR ORGAN SHARING; DUKE UNIVERSITY HEALTH SYSTEM, INC.; MEDICAL UNIVERSITY HOSPITAL AUTHORITY/MEDICAL CENTER OF THE MEDICAL UNIVERSITY OF SOUTH CAROLINA; BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA; and EMORY HEALTHCARE, INC,<br><br>      Defendants. | Case No.<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Cleveland Holt ("Mr. Holt") brings this Complaint against the United Network for Organ Sharing ("UNOS"); Duke University Health System, Inc. ("Duke"); Medical University Hospital Authority/Medical Center of the Medical University of South Carolina ("MUSC"); The Board of Trustees of the University of Alabama ("UAB"); and Emory Healthcare, Inc. ("Emory") (collectively "Defendants") (Duke, MUSC, UAB, and Emory are collectively the "Hospital Defendants"), and alleges as follows:

**INTRODUCTION**

1.      For more than two decades, UNOS and its affiliated transplant hospitals used what is known as the race-based coefficient to artificially increase the observed kidney function (eGFR) scores for Black kidney disease patients. The race-based coefficient delayed Black kidney disease patients from being added to the kidney transplant waitlist and resulted in Black candidates waiting much longer for kidney transplants than similarly-situated non-Black candidates.

2.      Use of the race-based coefficient was not the result of any valid scientific or peer-reviewed studies. Instead, developers of the race-based coefficient postulated that Black Americans showed increased levels of creatinine extraction because they have greater muscle mass than non-Black Americans; i.e., they relied solely on a defunct, eugenics-style racial stereotype.

3.      Making medical policy based on racial stereotypes harmed all Black Americans waiting for a kidney. This lawsuit focuses on only one of them—Mr. Cleveland Holt.

4.      After serving in the military, Mr. Holt started a career in machine operations. He worked his way up to lead operator for the Kimberly-Clark Corporation in Georgia, spending up to twelve hours a day on the operating floor, eventually earning a six-figure salary. He takes great pride in his years of hard work and dedication.

5. Mr. Holt was first diagnosed with kidney disease in 1999, and at that time, he was able to continue working his demanding job. He started a family and is the proud father of three children.

6. Eventually though, Mr. Holt's kidney disease worsened to the point where, in April of 2020, he began dialysis. Dialysis made it very difficult to maintain full-time employment, requiring Mr. Holt to drive to a clinic every Monday, Wednesday, and Friday, and draining Mr. Holt's time and energy.

7. Despite this burden, Mr. Holt continued working his operations job for roughly four months until, in August 2020, he was forced to cease work and apply for disability benefits. Dialysis was simply too demanding.

8. However, Mr. Holt needed the income and wanted to work, and he returned to his job in 2021, working while simultaneously receiving dialysis treatments. By November 2022 though, Mr. Holt could no longer handle working twelve-hour days while also undergoing dialysis. His poor health forced him into early retirement. The emotional worry, the weight loss, and the overbearing fatigue, were too much for him to bear.

9. From the moment he went on dialysis, Mr. Holt feared for his life. He understood that the life expectancy for dialysis patients was between four and five years. Mr. Holt felt the clock ticking. He had to have hard conversations with his wife and kids about death and planning for life after he was gone. Tears flowed.

10.     Mr. Holt was on the organ-donor waitlist at each one of the Hospital Defendants—biding his time and nursing his health until they could find a match.

11.     To make matters worse, Mr. Holt was diagnosed with heart disease in late 2021—caused by his kidney disease and dialysis.

12.     Mr. Holt suffered from chest pains. He had a stent placed in his heart around 2021, but the chest pains never abated. The dizziness, fatigue, and emotional trauma of one disease compounding another weighed heavily on his body and his mind.

13.     Mr. Holt's heart disease continued to worsen. In June of 2023, Mr. Holt underwent another stent procedure, which had to be repaired with angioplasty, causing yet more discomfort and pain. Later in 2023, he was diagnosed with obstructed sleep apnea. These conditions caused at least three transplant hospitals (Duke, MUSC, and UAB) to inform Mr. Holt that he was not currently eligible for a kidney transplant—his deteriorating health made a transplant procedure too risky—and, consequently, these hospitals deactivated Mr. Holt from the kidney waitlist.

14.     Nonetheless, in February 2024, Hines VA Hospital—another hospital where Mr. Holt was on the waitlist—called Mr. Holt and informed him that a matching kidney had become available. Hines VA Hospital informed Mr. Holt that the kidney had been through some "trauma," and might require additional dialysis

treatments after the transplant to allow the kidney to fully adapt to Mr. Holt's body. Despite these concerns, Mr. Holt informed Hines VA Hospital that he wished to receive the transplant.

15.     But out of utmost caution for his health, Mr. Holt called Hines VA Hospital back once more, and informed Hines VA Hospital that he had recently taken antibiotics as a result of an infection in his catheter. This infection had caused painful and debilitating side effects, including diarrhea and a yeast infection.

16.     Because of his recent antibiotics regimen, Hines VA Hospital informed Mr. Holt the kidney was no longer available, causing significant emotional trauma, and Mr. Holt continued to suffer from kidney and heart disease as he sought a donor kidney.

17.     Given Mr. Holt's desperate medical condition, and his disbelief after eight years of delay and setbacks that UNOS will ever award him a suitable kidney, Mr. Holt sought a private donor—his own daughter. Mr. Holt's daughter underwent testing that confirmed she could donate one of her kidneys to her father to save his life.

18.     The Pittsburgh VA Hospital agreed to schedule this transplant where other transplant hospitals expressly refused, citing concerns that Mr. Holt would not live through such a procedure. This procedure did in fact pose serious risks of lasting harm or death. However, Mr. Holt's only alternative—to avoid a transplant and

allow his kidney and heart disease to deteriorate further—would either (a) cost Mr. Holt his life in the near term, or (b) if Mr. Holt were awarded a kidney at some point in the future, made a transplant procedure even more difficult.

19.     The source of all of these physically and mentally traumatizing events? Defendants' use of the race-based coefficient to taint Mr. Holt's—and countless other Black patients'—eGFR scores. Defendants now admit these scores were artificially adjusted in a racist manner from the beginning.

20.     In June of 2022, UNOS admitted the racially discriminatory nature of the race-based coefficient for Black Americans. Thereafter, UNOS approved "a measure to require transplant hospitals to use a race-neutral calculation when estimating a patient's level of kidney function." In its press release, UNOS explained:

> For a number of years, some eGFR calculations have included a modifier for patients identified as Black. This practice has led to a systemic underestimation of kidney disease severity for many Black patients. Specifically in organ transplantation, it may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant.[1]

Despite prohibiting future use of the race-based coefficient, for six months, UNOS did nothing to adjust wait times for Black Americans already on the kidney waitlist.

---

[1] This Press release is publicly available at https://unos.org/news/optn-board-approves-elimination-of-race-based-calculation-for-transplant-candidate-listing/.

21.     In January of 2023, UNOS instructed donor hospitals to notify Black candidates of the policy change and investigate whether Black members of their waitlists were eligible for a wait-time modification, but UNOS gave donor hospitals *an entire year* to complete this process, until January of 2024.

22.     Through this process, in September of 2023, Mr. Holt was first informed by MUSC that he was entitled to a four-year wait time adjustment. That is, Mr. Holt was first added to UNOS's kidney waitlist through MUSC on or about March 2019. But absent Defendants' use of the race-based coefficient, Mr. Holt would have qualified to join the waitlist in 2016. Over the following months, the other Hospital Defendants, with the exception of Emory, informed Mr. Holt of similar wait time adjustments—the longest of which was *four and a half years*.

23.     Emory, meanwhile, gave Mr. Holt mixed messages. On the one hand, he received a message stating he did not qualify for a wait time adjustment. Yet, an Emory representative later informed him that he did, in fact, qualify for an adjustment.

24.     Upon information and belief, had Mr. Holt's wait time been calculated without application of the race-based coefficient before June of 2023, when Mr. Holt's heart disease progressed to the point that he required surgery to place a second stent and an angioplasty, Mr. Holt would have accrued roughly six-and-a-half years of qualifying wait time and would have received a kidney transplant by then, if not

significantly earlier.

25.     Mr. Holt's heart disease made a kidney transplant even more risky, which caused at least three transplant hospitals (Duke, MUSC, and UAB) to remove Mr. Holt from active consideration for a kidney, rendering his position on the waitlist "inactive" and Mr. Holt medically ineligible for a transplant at those hospitals.

26.     Had it not been for Mr. Holt's own daughter's bravery and generosity, Mr. Holt would still be waiting for a kidney from UNOS.

27.     Defendants' admitted discrimination against Black Americans by use of the race-based coefficient, at minimum, ruined Mr. Holt's life through years of delay and resulting debilitating dialysis treatments and heart surgeries, forcing Mr. Holt into early retirement. There must be serious consequences for hospitals and transplant organizations that engage in such racist discrimination.

## **PARTIES**

28.     Mr. Holt is an individual residing in Evans, Georgia.

29.     Defendant UNOS is a Virginia nonprofit corporation with its principal place of business in Richmond, Virginia.

30.     Duke is operated by Duke University Health System, Inc., a non-profit corporation with its principal place of business in Durham, North Carolina.

31.     MUSC is a hospital engaged in the provision of health care services and is operated by Medical University Hospital Authority/Medical Center of the Medical

University of South Carolina, located in Charleston, South Carolina.

32.     UAB is operated by the Board of Trustees of the University of Alabama, an agency of the State of Alabama, located in Birmingham, Alabama.

33.     Emory is a non-profit corporation with its principal place of business in Atlanta, Georgia.

## JURISDICTION AND VENUE

34.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 because Mr. Holt asserts a federal cause of action alleging racial discrimination. This Court further has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

35.     Venue in this district is proper pursuant to 28 U.S.C. § 1391 because Mr. Holt has been affected by Defendants' unlawful policies and procedures within this District. Each of the Defendants have transacted with Mr. Holt within the District, thus, a substantial part of the events or omissions that gave rise to the claims asserted herein occurred within this District.

36.     This Court has personal jurisdiction over UNOS because UNOS conducts operations within Georgia by virtue of its management of the kidney donor list for all patients residing within the State, including Mr. Holt. UNOS makes decisions as to which patients residing in Georgia will be offered donor kidneys.

37.     This Court has personal jurisdiction over Emory because Emory

maintains its principal place of business within the State, and harmed Mr. Holt by virtue of the unlawful conduct alleged herein within this State.

38.    This Court has personal jurisdiction over the remaining transplant Hospital Defendants (Duke, MUSC, and UAB) because they conduct business within Georgia by virtue of their hospital-patient relationships with Mr. Holt, and the doctor-patient relationships between Mr. Holt and the doctors employed thereby with Mr. Holt. Mr. Holt's claims arise out of those relationships, and thus arise out of these Defendants' unlawful conduct alleged herein within Georgia.

39.    Additionally, in 1984, Congress passed the National Organ Transplant Act ("NOTA"), creating the Organ Procurement and Transplantation Network ("OPTN"), which was tasked with maintaining a national registry for organ matching. Per the Act, this registry was to be operated by a private, non-profit organization under federal contract, and since the OPTN's inception, UNOS has been the non-profit organization that operates the kidney transplant waitlist on an interconnected, nationwide basis.

40.    Transplant hospitals like the Hospital Defendants must agree to abide by the UNOS and OPTN policies and bylaws in order to be allowed to operate as transplant hospitals. Given the interstate nature of the nationwide kidney transplant waitlist and the UNOS and OPTN policies and bylaws, transplant hospitals commonly register patients not only in their home state, but within their geographic

region.

41.     Upon information and belief, kidney allocation policies dictate that in most instances, kidneys harvested from within a 250 nautical mile "preferred zone" of a transplant hospital are first offered to candidates registered at a transplant hospital located within that same preferred zone.

42.     Each of the Hospital Defendants' 250 nautical mile preferred zones extend well into Georgia, including Mr. Holt's residence in Evans, Georgia. This means that each of the Hospital Defendants take in donor kidneys harvested from Georgia donors, and offer those Georgia kidneys to members of their waitlist. Indeed, each of the Hospital Defendants' waitlist members get preferred status for Georgia kidneys.

43.     Duke, UAB, and MUSC are benefited by this connection to Georgia because, for example, Duke is not limited to offering its patients donor kidneys from North Carolina donors. Duke can reach into Georgia for donor kidneys, giving its patients a better chance at receiving a donor kidney, increasing the level of care Duke can provide, and thus bringing more patients and money into the hospital. The same is true for UAB and MUSC, which can reach outside of Alabama and South Carolina, respectively, into Georgia.

44.     Because UNOS and OPTN policies consider proximity of the donor to any particular transplant hospital, as opposed to, for example, keeping donor kidneys

within the state they were harvested, kidney transplant candidates are incentivized to register at transplant hospitals outside of their state. Doing so increases the harvest area for which a transplant candidate is considered a preferred candidate.

45.     By agreeing to participate in this nationwide ecosystem, it was entirely foreseeable to Duke, UAB, and MUSC that out-of-state patients like Mr. Holt, nonetheless within their geographic region, would join their kidney waitlists. Just as these hospitals cross state lines to pull donor kidneys from Georgia, Georgia patients like Mr. Holt fairly seek to be considered for donor kidneys harvested in nearby states within their region.

## GENERAL ALLEGATIONS

### A.     The national kidney transplant waitlist is controlled by the Defendants, and wait time is the primary factor considered in awarding donor kidneys.

46.     In 1984, Congress passed the NOTA, creating the OPTN, which was tasked with maintaining a national registry for organ matching. Per the Act, this registry was to be operated by a private, non-profit organization under federal contract.[2]

47.     Since that time, UNOS has acted as that private, non-profit organization which operates the OPTN. As its website declares, UNOS "[m]anag[es] the national

---

[2] Patients can also seek a kidney from a private donor, such as a family member or friend, at the same time as they wait for a kidney on the national waitlist.

transplant waiting list, matching donors to recipients 24 hours a day, 365 days a year." UNOS establishes and implements policy concerning how donor kidneys will be awarded to patients with kidney disease.

48.     To be placed on the national kidney transplant waitlist, a patient must first visit one of 200+ transplant hospitals, and receive a referral from his physician. In this way, the transplant hospitals, like the transplant Hospital Defendants sued herein, serve as gatekeepers to patients seeking to be placed on the national kidney waitlist.

49.     The national kidney waitlist is maintained using UNOS software, known as UNet. When a new patient is added to the waitlist, the referring hospital enters the patient's name and relevant medical information, including eGFR scores, into the UNet software, which tracks patient medical information and wait time.

50.     Each time a donor kidney becomes available, UNet's algorithm considers the information maintained in UNet, generates a list of potential matches, and ranks potential matches on the national kidney waiting list. These kidneys are then offered to patients through the transplant hospitals, in accordance with the UNet-generated rankings.

51.     Upon information and belief, the primary factor considered by UNet's algorithm to rank candidates for potentially compatible kidneys is a patient's accrued wait time. In other words, UNet will identify patients that are a medical match for a

particular available kidney, and then rank those patients according to wait time.

52.     Importantly, referral to the waitlist does not automatically start the clock on qualifying wait time. Generally, to accrue qualifying wait time, either a patient's eGFR score must fall below 20 ml/min or the patient must begin dialysis.

**B.**     **The Defendants applied a racially discriminatory coefficient to Black patients' eGFR scores.**

53.     UNOS is responsible for enacting policy that determines which patients receive which donor kidneys. In this regard, UNOS offers as one of its strategic goals to "[p]rovide equity in access to transplants[.]" UNOS has fallen far short of its stated goal.

54.     For decades, the race-based coefficient was applied to artificially inflate eGFR scores for Black Americans, overstating their kidney function by 16–18%, based upon the underlying assumption that Black Americans have greater muscle mass and thus naturally have more creatinine in their bodily systems.

55.     As noted above, patients do not begin accruing wait time on the national kidney waitlist until their eGFR score reaches 20 ml/min. But for Black patients, even when their unadjusted eGFR score fell below 20 ml/min, the race-based coefficient artificially inflated their eGFR scores above 20 ml/min, preventing them from qualifying to accrue wait time. Thus, Black patients' eGFR scores had to fall well below 20 ml/min before they began to accrue wait time.

56.     This practice led to many Black kidney disease patients never

qualifying for wait time by eGFR score because their addition to the waitlist was delayed until the patients had to start of dialysis (which is recommended when kidney function falls below 15 ml/min).

57.    UNOS's policy encouraged and allowed for use of the race-based coefficient, and UNOS knowingly used modified eGFR scores and manipulated wait times when ranking patients for kidney transplants. Specifically, UNOS is and has at all times been aware that its UNet software includes an algorithm that uses wait time as the primary factor in ranking patients for donor kidneys, and that its UNet software includes wait times for Black patients that have been manipulated by application of the race-based coefficient, including Mr. Holt's original wait time calculation. To be clear, this modification was made to Black patients' eGFR scores entirely because of their race and was not applied to other racial groups.

58.    There has never been any serious scientific research to support use of the race-based coefficient to artificially increase Black patients' eGFR scores. Instead, the race-based coefficient is based on eugenics-style racism and stereotypes that assume Black Americans are more physically fit than White Americans and other racial groups.

59.    This, of course, is junk science supported only by racial stereotypes, and not any valid scientific studies. As described in an article titled *Systemic Kidney Transplant Inequities for Black Individuals: Examining the Contribution of*

*Racialized Kidney Function Estimating Equations*, the theory supporting the race-based modification to Black patients' eGFR scores has "not been substantiated by rigorous scientific evidence[.]"

60.   Years before UNOS took any action to review its policy allowing for use of the race-based coefficient, the practice was criticized by doctors for its racially discriminatory nature. For example, in November of 2011, Dr. Toni Martin published an article in the *American Journal of Kidney Diseases* that questioned the practice, explaining that when she attempts to explain the policy to Black patients, she "get[s] a snort of disbelief[,]" and noting the history of purported genetic differences being used against Black Americans against a backdrop of "separate and unequal."[3]

61.   Use of the race-based coefficient seriously diminishes Black patients' chances of receiving a donor kidney. For Black patients that overcome the odds and do receive a kidney from the national waitlist, their wait time is still significantly increased. Indeed, because of this eGFR manipulation, many Black patients never qualified to accrue wait time because of their eGFR score, and only began to accrue wait time when they began dialysis.

62.   All other factors being equal, the above-described practices have

---

[3] To be clear, Mr. Holt was unaware of this article, and Mr. Holt was further unaware that his race affected his position on the waitlist until the latter half of 2023.

resulted in non-Black patients receiving numerous kidneys that would otherwise have been given to Black applicants had their wait time been calculated without consideration of race.

63.    The failure to receive donor kidneys has caused significant harm to Black Americans. The unfortunate reality is that many Black Americans, who could have survived if fairly considered for a donor kidney, have already passed away.

64.    Other Black Americans have suffered worsened kidney disease and/or been forced into dialysis treatment because of the lengthened wait time for a donor kidney. These Black Americans have suffered economic damages in the form of medical expenses and lost wages.

## C.    **Even after UNOS admitted that the race-based coefficient discriminates against Black Americans, Defendants refused to timely address the problem**.

65.    In June of 2020, UNOS acknowledged the racial inequity plaguing the transplant system and the need for reform. In an article found at https://unos.org/news/racial-equity-in-transplantation/, UNOS professed a "commitment" to "saving and improving lives through transplantation, regardless of background, including race and ethnicity." But the race-based coefficient would remain in effect for years to come.

66.    In June of 2022, UNOS admitted the racially discriminatory nature of the race-based coefficient for Black Americans, approving "a measure to require

transplant hospitals to use a race-neutral calculation when estimating a patient's level of kidney function." In its press release, UNOS explained that:

> For a number of years, some eGFR calculations have included a modifier for patients identified as Black. This practice has led to a systemic underestimation of kidney disease severity for many Black patients. Specifically in organ transplantation, it may have negatively affected the timing of transplant listing or the date at which candidates qualify to begin waiting time for a transplant.[4]

67.    UNOS posted the following passage on its website:



**What are other issues with the race variable in eGFR?**

EGFR calculations rely on a binary approach to race. When the race variable is used in formulas, eGFR calculators only offer two response options: "Black" or "Not Black."

These options do not include a designation for mixed race or multi-racial individuals, and do not account for the existing genetic diversity within the Black population.  The concept of race is a social construct and an unreliable proxy for genetic difference, therefore not a biological marker or clinical measure.

68.    UNOS's policy officially changed on July 27, 2022, with UNOS's policy prior to that time expressly allowing for use of the race-based coefficient to artificially increase Black patients' eGFR scores.

---

[4] This Press release is publicly available at https://unos.org/news/optn-board-approves-elimination-of-race-based-calculation-for-transplant-candidate-listing/.

69.    Nonetheless, UNOS continued to use the race-based coefficient as a default. For more than six months, UNOS took no affirmative steps to adjust wait times and correct for previous use of the race-based coefficient.

70.    On January 5, 2023, UNOS announced a new policy that would require donor hospitals to provide two notifications to patients on the national kidney waitlist, one notifying patients that Black Americans will be considered for wait time adjustments where the race-based coefficient delayed their accrual of wait time, and a second notification confirming this process was completed and informing patients of their status. UNOS also directed donor hospitals to investigate which patients are eligible for a wait time adjustment, and to request said adjustments with UNOS within a year, i.e., by January of 2024.

71.    While this adjustment in policy rightfully acknowledged the racially discriminatory nature of the race-based coefficient, it lacked the requisite urgency, and for many of the 27,500 Black Americans then on the national kidney waitlist, like Mr. Holt, the policy change was too little too late. During the 18 months of lag time in adjusting wait times, Black Americans continued to suffer a race-based disadvantage in their candidacy for a donor kidney, with UNet continuing to utilize the old, improperly calculated wait times when awarding kidneys.

72.    Indeed, as discussed below, Mr. Holt developed serious heart problems near the end of the time period provided by UNOS for transfer hospitals to correct

their wait time calculations, that could have potentially been avoided had Defendants moved faster to update their records.

**D.**     **As a result of not being awarded a kidney in the transplant market, Mr. Holt has suffered significant harms**.

73.     Had the race-based coefficient not been applied to Mr. Holt's eGFR score, his score would have been measured at 19 mL/min on or about December 6, 2016. That score is below the 20 mL/min cutoff that should have qualified Mr. Holt to join the kidney waitlist and begin accruing wait time.

74.     However, solely because Mr. Holt is Black, the race-based coefficient was applied to Mr. Holt's eGFR score to artificially increase his score above 20 mL/min, and Mr. Holt was not added to the kidney waitlist.

75.     Mr. Holt was first placed on the waitlist at Pittsburgh VA Hospital roughly eighteen months later on June 29, 2018. This was the first time he was added to any kidney waitlist.

76.     In April of 2020, Mr. Holt's kidney disease worsened to the point he was required to start dialysis.

77.     Since that time, Mr. Holt has been required to travel to dialysis clinics and undergo treatment for multiple hours per day, three days per week, for years. The treatment is unpleasant and drains Mr. Holt's physical and mental energy, and has also caused Mr. Holt to suffer from severe emotional distress.

78.     Mr. Holt was also forced, first, to quit his six-figure job to apply for

disability. Then, after briefly returning to work, he was forced into early retirement.

79.  Mr. Holt's kidney disease put increased strain on his heart and caused Mr. Holt to develop heart disease. Mr. Holt's heart disease was diagnosed in late 2021, prior to the processing of his wait-time adjustment, but roughly five years after he would have been placed on the waitlist but for application of the discriminatory race-based coefficient (December of 2016).

80.  To treat Mr. Holt's heart disease, around the middle of 2023, Mr. Holt underwent a surgical procedure to place a stent in his heart, or in technical terms, "[s]evere in-stent restenosis involving the mid circumflex and the ostium of a large bifurcating second obtuse marginal[.]"

81.  Following this procedure, it was unclear whether Mr. Holt will be able to survive a kidney transplant even if he was awarded a donor kidney. In this regard, Duke, MUSC, and UAB informed Mr. Holt that he was being removed from their kidney waitlists because Mr. Holt was physically unable to undergo a transplant procedure.

82.  For example, UAB stated, "Based on this information, you have been placed on INACTIVE status on the transplant list until this is resolved. Inactive status means that you will continue to accrue time on the list, but will not be called in for a kidney transplant. Inactive Reason: multiple cardiac procedures requiring coronary stent placements."

83.     The combination of Mr. Holt's kidney disease, and now heart disease, has required Mr. Holt to go through a litany of expensive, unpleasant medical procedures, resulting in physical pain, an inability to work or enjoy life, and severe emotional distress.

84.     Even though Mr. Holt has survived his kidney transplant—being forced to turn to his daughter for a kidney and risk her health because UNOS never awarded him a kidney—Mr. Holt must still contend with his heart disease, and the time he will never get back.

85.     This would have all been avoided had Defendants not discriminated against Mr. Holt. Mr. Holt was entitled to join the waitlist in 2016, and Mr. Holt should have had seven eligible years on the kidney transplant waitlist prior to the development of his heart disease and other fall-on medical issues. Absent Defendants' discrimination, upon information and belief, Mr. Holt would have received a donor kidney before he developed heart disease and a catheter infection.

## FIRST CAUSE OF ACTION
### (Violation of Title VI of the Civil Rights Act of 1964)

86.     Mr. Holt re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth above.

87.     This cause of action is brought by Mr. Holt against all Defendants.

88.     UNOS and each of the Hospital Defendants receive significant financial assistance from the Federal government.

89.     In this regard, approximately 10% of UNOS's budget is provided by the Federal government, in accordance with the National Organ Transplant Act's authorization of $7,000,000/year to fund a private, non-profit entity such as UNOS. These contracts were intended by the Federal government to act as a subsidy to UNOS, not as compensation for any goods or services provided by UNOS to the Federal government, for which there are none.

90.     Each of the Hospital Defendants receive significant financial assistance from the Federal government and its programs, funding both patient care and other related operations.

91.     Defendants have engaged in racial discrimination. As alleged in detail above, Defendants allowed and encouraged use of the race-based coefficient to artificially inflate Black patients including Mr. Holt's eGFR scores, with UNOS adopting, encouraging, and implementing the race-based coefficient, and the Hospital Defendants applying the race-based coefficient directly, thus delaying Mr. Holt's accrual of wait time, and prejudicing his chances of receiving a donor kidney.

92.     Defendants further knowingly input and used these modified wait times for Black patients in UNOS's UNet software, causing Black patients to be ranked lower for specific donor kidneys than non-Black patients. Even after UNOS admitted the practice was racially discriminatory, all Defendants failed to take prompt action to ensure Black patients' (including Mr. Holt's) wait times were recalculated.

93.     The damages resulting from the above-described racial discrimination include but are not limited to depriving and/or delaying Mr. Holt's award of a donor kidney. This discrimination also caused Mr. Holt to incur economic injuries, including but not limited to, continued medical costs such as dialysis costs and costs resulting from heart disease, obstructed sleep apnea, an infection in his catheter, a yeast infection, and also lost wages stemming from early retirement because of additional dialysis treatments and other resulting medical conditions caused by application of the race-based coefficient by Defendants.

94.     The above-described racial discrimination caused additional damages including but not limited to pain and suffering, severe emotional distress resulting in a looming fear of death and accompanying tearful conversations with his wife and children, constant fatigue, the inability to travel, and the loss of enjoyment of life.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty)

95.     Mr. Holt re-alleges and incorporates herein by reference, as though set forth in full, each of the allegations set forth above.

96.     As the transplant hospitals for Mr. Holt, the Hospital Defendants owed Mr. Holt a fiduciary duty.

97.     Defendants breached their fiduciary duties by engaging in racial discrimination against their fiduciaries. As to UNOS, as alleged in detail above, UNOS allowed and encouraged use of the race-based coefficient to artificially

inflate Mr. Holt's eGFR score, thus delaying his accrual of wait time, and prejudicing his chances to receive a donor kidney.

98.   UNOS further knowingly used this modified wait time in its UNet software, causing Mr. Holt to be ranked lower for specific donor kidneys than non-Black patients. Even after admitting the practice was racially discriminatory, UNOS failed to take prompt action to ensure Mr. Holt's wait time was recalculated.

99.   The Hospital Defendants breached their fiduciary duty by knowingly submitting eGFR scores tainted by use of the race-based coefficient to UNOS for inclusion in its UNet algorithm, prejudicing Mr. Holt's chances of receiving a donor kidney. Even after UNOS changed course and prohibited the use of the race-based coefficient, the Hospital Defendants failed for more than a year to recalculate Mr. Holt's wait time.

100.   The damages resulting from the above-described breaches of fiduciary duty include but are not limited to depriving and/or delaying his award of a donor kidney. This discrimination also caused Mr. Holt to incur economic injuries, including but not limited to, continued medical costs such as dialysis costs and costs resulting from heart disease, obstructed sleep apnea, an infection in his catheter, and also a lower income stemming from early retirement because of additional dialysis treatments resulting from application of the race-based coefficient by Defendants.

101.   The above-described breaches of fiduciary duty caused additional

25

damages including, but not limited to, pain and suffering and severe emotional distress resulting in a looming fear of death and accompanying tearful conversations with his wife and children, constant fatigue, the inability to travel, and the loss of enjoyment of life.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Holt prays for relief against Defendants as follows:

1.     For damages in compensation for the economic, medical, personal injuries, and pain and suffering sustained by the Mr. Holt in an amount to be determined by evidence;

2.     For punitive damages in an amount according to proof;

3.     For pre-judgment interest on all damages awarded by this Court;

4.     For reasonable attorneys' fees and costs of suit incurred herein; and

5.     For such other and further relief as the Court deems just and proper.

Respectfully submitted, April 16, 2024.

WASHINGTON DREYER &
ASSOCIATES, LLC

 _/s/ David N. Dreyer_
David N. Dreyer, Esq.
Georgia Bar No. 141322
david@washingtondreyer.com
260 Peachtree Street, Suite 1600
Atlanta, Georgia 30303
(404) 236-6282

*Attorneys for Plaintiff Cleveland Holt*

## **<u>DEMAND FOR JURY TRIAL</u>**

Mr. Holt hereby demands a jury trial as provided by Rule 38(a) of the Federal

Rules of Civil Procedure.

Respectfully submitted April 16, 2024.

WASHINGTON DREYER &
ASSOCIATES, LLC

 */s/ David N. Dreyer*
David N. Dreyer, Esq.
Georgia Bar No. 141322
david@washingtondreyer.com
260 Peachtree Street, Suite 1600
Atlanta, Georgia 30303
(404) 236-6282


*Attorneys for Plaintiff Cleveland Holt*

## **L.R. 7.1(D) CERTIFICATION**

I certify that this Notice has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C). Specifically, this Notice has been prepared using 14-pt Times New Roman Font.

Respectfully submitted April 16, 2024.

WASHINGTON DREYER &
ASSOCIATES, LLC

 */s/ David N. Dreyer*
David N. Dreyer, Esq.
Georgia Bar No. 141322
david@washingtondreyer.com
260 Peachtree Street, Suite 1600
Atlanta, Georgia 30303
(404) 236-6282


*Attorneys for Plaintiff Cleveland Holt*