## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| CLEVELAND HOLT,<br><br>　　　　*Plaintiff*<br><br>*v.*<br><br>UNITED NETWORK FOR ORGAN SHARING, *et al.*<br><br>　　　　*Defendants.* | Civil Action File No.<br>1:24-cv-01599-VMC |

## DEFENDANT EMORY HEALTHCARE, INC.'S
## BRIEF IN SUPPORT OF MOTION TO DISMISS

## <u>INTRODUCTION</u>

This case concerns Title VI of the Civil Rights Act of 1964 and the nation's kidney transplant system. Recognizing the need for a national health policy for organ transplants, Congress passed the National Organ Transplant Act in 1984, which established the Organ Procurement Transplant Network (or the "OPTN"). The OPTN is comprised of transplant hospitals like Defendant Emory Healthcare, Inc. ("Emory"). And since its inception, the OPTN has been operated by Defendant United Network for Organ Sharing ("UNOS"). The allegations in this case concern an aspect of the OPTN's kidney allocation policy.

Plaintiff Cleveland Holt alleges that, "[f]or more than two decades," Defendants invidiously discriminated against Black kidney disease patients, with resect to kidney allocation in favor of "similarly-situated non-Black candidates," in violation of Title VI. Doc. 1, Compl. at ¶ 1. According to Holt, Defendants' medical professionals across the nation were *not* basing healthcare decisions on "valid scientific or peer-reviewed studies," but "solely" on "defunct, eugenics-style racial stereotype[s]." Doc. 1, at ¶ 2. Through their alleged reliance on the widely-used clinical formulas for estimating patients' kidney functioning, Holt claims that Defendants "artificially increase[d]" his estimated kidney functioning score in order to intentionally delay his and other Black kidney disease patients' wait-times for kidney transplants. But those sorts of headlines-grabbing accusations must be plausible to withstand scrutiny under Rule 12(b)(6). And here, they are not.

Holt does not plausibly allege that Emory was deliberately indifferent to discrimination in its kidney transplant programs, so he cannot state a claim for damages under Title VI. Alternatively, the Court can avoid the merits, because it should dismiss Holt's claims on statute of limitations grounds as well. If Holt's allegations of decades-long discrimination are to be credited, then his claims necessarily accrued nearly a decade ago. Holt cannot plead ignorance to avoid that conclusion. Finally, even if the Court does not dismiss

Holt's Complaint in its entirety, the Court should still dismiss Holt's Title VI claim to the extent he seeks impermissible damages.

In short, the Court should GRANT Defendant Emory's Motion to Dismiss, and DISMISS Holt's Complaint with prejudice.

## **LEGAL STANDARD**

***Fed. R. Civ. P. 12(b)(6)***. To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual material, accepted as true, such that it states a claim "'that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard requires factual allegations specific enough "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although well-pleaded factual allegations are entitled to a presumption of truth, courts must disregard legal conclusions, generic labels, and unadorned recitations of the elements of a cause of action. *Iqbal*, 556 U.S. at 678–79.

***Exceptions to Fed. R. Civ. P. 12(d).*** While a motion under Rule 12(b)(6) must be converted into one for summary judgment if "matters outside the pleadings" are considered by the court, Fed. R. Civ. P. 12(d), there are a couple of "exceptions to this conversion rule." *Baker v. City of Madison,* 67 F.4th 1268, 1276 (11th Cir. 2023). A court may consider documents incorporated into the complaint by reference, and it may also take judicial notice of other materials.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007);

*Baker*, 67 F.4th at 1276. Here, both exceptions are applicable.[1]

## BACKGROUND

### I.    Procedural and Factual Background

***The Parties.*** Plaintiff Cleveland Holt alleges he began suffering from kidney disease in 1999. Doc. 1 at ¶¶ 5, 28. When his kidney disease worsened, he claims he sought a kidney transplant through the OPTN. *See* Doc. 1 at ¶ 22, 39–42. In his Complaint, Holt names the following entities as Defendants:

- United Network for Organ Sharing ("UNOS");

- Duke University Health System, Inc. ("Duke");

- Medical University Hospital Authority/Medical Center of the Medical University of South Carolina ("MUSC");

- Board of Trustees of the University of Alabama ("UAB"); and

- Emory Healthcare, Inc. ("Emory").

Doc. 1 at ¶¶ 29–33. As noted, UNOS is the non-profit organization that operates the OPTN and, relevant here, the kidney transplant waiting list. Doc. 1 at ¶ 29. The remaining Defendants, collectively referred to as the "Hospital

---

[1]   For example, the medical journal article referenced in Paragraph 59 has been incorporated by reference into the Complaint under Rule 10(c). *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). And since the OPTN policies and policy-making reports are essentially administrative rule-making material, those documents are also properly considered via judicial notice. *See, e.g., Mr. S. v. Reg'l Sch. Unit 72*, 829 F.3d 95, 104 n.4 (1st Cir. 2006).

Defendants," operate transplant hospitals participating in the OPTN. *See* Doc. 1 at ¶ 10. Holt alleges that he was a patient at these hospitals and sought a kidney transplant from them. *Id.*

**The Complaint.** Holt filed his Complaint on April 16, 2024. Doc. 1. He asserts two causes of action. *See* Doc. 1 at ¶¶ 86–101. Count One asserts a claim for a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Doc. 1 at ¶¶ 86–94. Count Two asserts a generic state law claim for a breach of fiduciary duty. Doc. 1 at ¶¶ 95–101. Although Title VI does not expressly authorize a private cause of action for damages, the Supreme Court has implied one for intentional discrimination, as it did for Title IX, its statutory cousin. *Alexander v. Sandoval*, 532 U.S. 275, 279–280, 293 (2001).[2]

## II.   Medical and Regulatory Background

Holt claims that he never ultimately received a kidney transplant through the OPTN because of Defendants' alleged discrimination. Some background on kidney disease and the nation's kidney transplant system provides much needed context for Holt's novel claims.

---

[2] *See also Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 286 (1998). Because of the similarities between the statutes, decisions regarding Title IX (and other related anti-discrimination statutes) are generally instructive as to Title VI's implied right of action. *See, e.g., Adams v. Demopolis City Schs.*, 80 F.4th 1259, 1273 (11th Cir. 2023).

***Kidney Disease and eGFR.*** Our kidneys filter our blood "by removing waste and extra water[.]"[3] When people develop chronic kidney disease, their kidneys' filtration ability begins to degrade. To evaluate this, a doctor determines the patient's glomerular filtration rate (or "GFR"). Lower GFR scores correspond with more severe kidney disease. But, measuring GFR is "challenging" because it can be "a complicated and lengthy process." So, doctors often resort to a formula for estimating GFR (or "eGFR").[4]

Over the years, the formulas for estimating GFR evolved as medical understanding of kidney functioning evolved.[5] For example, in 2009, researchers developed the Chronic Kidney Disease Epidemiology Collaboration equation (the 2009 CKD-EPI equation), which was indisputably "a more accurate method for estimating GFR," than prior methods.[6] The 2009 CKD-EPI equation was developed "through analysis of a number of independent studies and combined data from thousands of individuals."[7] And like its predecessor formula, the Modification of Diet in Renal Disease ("MDRD")

---

[3] *See, e.g.*, National Kidney Foundation, Estimated Glomerular Filtration Rate (eGFR), https://www.kidney.org/atoz/content/gfr

[4] *Id.*

[5] *See* OPTN, Briefing to the OPTN Board of Directors, *Establish OPTN Requirement for Race-Neutral Estimated Glomerular Filtration Rate (eGFR) Calculations*, at 5 (June 27, 2022) [hereinafter "OPTN Briefing Paper"], attached as Exhibit 1.

[6] *Id.*

[7] *Id.*

equation, the research behind the 2009 CKD-EPI equation revealed "racial differences in serum creatinine levels," which the formula accounted for.[8]

*National Organ Transplant Act.* As noted, Congress passed the National Organ Transplant Act in 1984, to establish a nationwide system for organ transplantation in order to alleviate the logistical and medical problems associated with organ transplants.   Pub. L. 98-507, 98 Stat. 2339 (1984) (codified at 42 U.S.C. § 274). The Act established the OPTN, which UNOS operates and manages. 42 U.S.C. § 274. Subject to oversight by the Department of Health and Human Services, the OPTN makes nationwide policy for the allocation of organs. *See* 42 C.F.R. § 121.8; *see also* OPTN, *Policies* (effective May 2, 2024).[9] To participate in the OPTN, transplant hospitals, like the Hospital Defendants, must abide by those policies. 42 U.S.C. § 1320b-8(B).

*The Kidney Allocation Policy.* Policy 8 governs kidney allocation.[10] To be eligible for a kidney transplant, a patient must meet certain criteria. If those criteria are met, then an available kidney will be allocated among eligible patients based on priority. And priority, in turn, is generally based on the amount of time a patient has waited on the waitlist.

To begin accruing wait-time on UNOS's wait-list, the policy requires that

---

[8]   *Id.*

[9]   Available at https://optn.transplant.hrsa.gov/policies-bylaws/policies/

[10]   *See* OPTN, *Policies*, Policy 8 at 142.

the patient meet one of the following criteria:

    1. The patient receives a GFR score less than or equal to 20mL/min; or

    2. The patient begins dialysis for end stage renal disease.[11]

***Critiques of the eGFR Formulas Emerge.*** As Holt acknowledges, critiques concerning the 2009 CKD-EPI equation emerged soon after its development. Doc. 1 at ¶ 60. As the "concept of race [as] a social construct" developed more fully over the years, *see id.* at ¶ 67, further research later undermined the statistical observations in the MDRD and CKD-EPI studies. This later research suggested that the 2009 CKD-EPI equation had the potential to over-estimate Black kidney disease patients' eGFR scores under certain circumstances. And accordingly, it suggested the potential for certain Black kidney disease patients' accrual of wait-times for transplants to be delayed, since wait-time accrual can be tied to an eGFR score.[12]

***Calls for a Race-Neutral eGFR Formula.*** Policymakers and medical professionals across the country recognized the potential need to recalibrate the eGFR formulas considering the additional research that developed. In July 2020, for example, the National Kidney Foundation and others announced a task force to reassess the inclusion of race in eGFR formulas.[13] Later that year,

---

[11] *See* Ex. 1, OPTN Briefing Paper at 4.

[12] *See id.* at 6.

[13] Ex. 1, OPTN Briefing Paper at 7.

a congressional committee solicited comments from UNOS regarding this issue and others, to which UNOS responded one month later in December 2020.[14]

By March 2021, the OPTN announced a committee to investigate potential changes to OPTN policies regarding eGFR calculations, which coincided in time with a joint statement by the National Kidney Foundation, urging for the removal of the race-conscious coefficient from eGFR calculations. By June 2021, the National Kidney Foundation's task force released their interim report as to whether the elimination of the race-conscious coefficient was medically and scientifically sound. The report concluded that it could be done and outlined a path forward. The report was supplemented and formally published in September 2021.[15]

***The OPTN Policy for eGFR Scores Is Amended.*** The OPTN committee's progress was tracking the National Kidney Foundation's task force. And, in August 2021, as government policymaking requires, the OPTN called for public comment regarding the OPTN's policy proposal to eliminate the use of eGFR formulas that included any race-conscious coefficient. By January 2022, the public comment period closed, and the policy proposal was

---

[14] *Id.*

[15] Delgado, et al., *A Unifying Approach for GFR Estimation: Recommendations of the NKF-ASN Task Force on Reassessing the Inclusion of Race in Diagnosing Kidney Disease*, 79(2) Am. J. Kidney Dis. (published online Sept. 23, 2021).

finalized, published, and then later presented to the OPTN Board for adoption, which occurred later that year in July 2022.[16]

## ARGUMENT

**I.     Holt does not plausibly allege a Title VI claim against Emory.**

### A.     Title VI's implied cause of action requires deliberate indifference to known discrimination.

Title VI's implied cause of action contains a demanding liability standard. To recover compensatory damages, a plaintiff like Holt must allege and prove, among other elements, that the funding recipient was deliberately indifferent to known acts of discrimination in its programs or activities. *Adams v. Demopolis City Schs.*, 80 F.4th 1259, 1273 (11th Cir. 2023); *see Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 290 (1998) (adopting deliberate indifference under Title IX); *see also Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 345–48 (11th Cir. 2012) (Rehabilitation Act claims). The deliberate indifference standard contains two components: (1) an entity's actual knowledge of discrimination and (2) an entity's intentional failure to remedy the discrimination. *Adams*, 80 F.4th at 1270; *Liese*, 701 F.3d at 344; *see also Delgado v. Stegall*, 367 F.3d 668, 671–72 (7th Cir. 2004). Thus, an appropriate official with authority to stop the discrimination must be provided with notice of it and then fail to correct it; respondeat superior principles are

---

[16] *See* Ex. 1, OPTN Briefing Paper, at 8.

inapplicable. *See Gebser*, 524 U.S. at 290–91; *Davis ex rel. LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640–41 (1999).

In the context of Title IX claims,[17] the Eleventh Circuit has reasoned that an appropriate official is "someone who enjoys substantial supervisory authority within an organization's chain of command," *Liese*, 701 F.3d at 350, such that he or she is able "to 'take corrective measures' in response to allegations of [discrimination]." *Doe v. Sch. Bd. of Broward County*, 604 F.3d 1248, 1256 (11th Cir. 2010). Actual knowledge can be demonstrated in several ways. *See J.F.K. v. Troup County Sch. Dist.*, 678 F.3d 1254, 1260 (11th Cir. 2012). Although it can be shown through knowledge of the precise discrimination to the plaintiff, it can sometimes be shown through notice of other instances of similar discrimination. *Id.* Finally, the "indifference" component to the liability standard is also exacting. *Adams*, 80 F.4th at 1270, 1273–74. "[N]either negligence nor mere unreasonableness is enough." *Id.* at 1270. The entity's response to the discrimination must be "clearly unreasonable in light of the known circumstances." *See Davis*, 526 U.S. at 648. An entity "is not deliberately indifferent simply because the measures it takes to stop the . . . discrimination ultimately are ineffective." *Adams*, 80 F.4th at 1270; *see Gebser*, 524 U.S. at 290.

---

[17] *See* note 2, *supra*.

**B.    Holt does not plausibly allege that Emory was deliberately indifferent to known discrimination.**

Holt has not stated a Title VI claim for damages because he does not plausibly allege either prong of the deliberate indifference standard.

*1.    Holt does not plausibly allege actual knowledge.*

First, Holt does not identify a single individual at Emory that had actual knowledge of the alleged discrimination supposedly existing within Emory's transplant program. This is fatal to his claim. Although analyzing whether someone is an appropriate official (for purposes of actual notice) is often "fact-intensive," *Liese*, 701 F.3d at 350, Holt does not identify *anyone* connected with Emory for the Court to conduct that inquiry. *See Lansberry v. Altoona Area Sch. Dist.*, 318 F.Supp.3d 739, 751 (W.D. Pa. 2018) (allegations regarding "unidentified school 'personnel' and an unnamed 'teacher'" were insufficient under Rule 12(b)(6)). Bereft of "any allegations that an appropriate person with [Emory] had actual knowledge of the acts that [Holt] alleges constitute discrimination," Holt's Title VI claim "cannot survive a 12(b)(6) motion to dismiss." *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1294 (11th Cir. 2007) (dismissing under actual notice prong as to certain entities).

Furthermore, Holt does not plausibly allege that anyone at Emory was actually aware that the use of the eGFR formulas was discriminatory. Recall, the implied right of action authorizes suit only for *intentional* discrimination.

*Alexander*, 532 U.S. at 281, 293. Thus, it is not sufficient for Holt to allege that there was general knowledge that eGFR formulas incorporated race (or sex) to account for observed biological differences. In the context of medical decision-making—where race, sex, age, disability, or another protected characteristic correlates with the appropriateness of a certain medical treatment under the pertinent standard of medical care—then actionable discrimination requires that the decision-making be based on considerations "having *no relevance* to medical appropriateness—reasons dictated by bias rather than medical knowledge[.]" *See McGugan v. Aldana-Bernier*, 752 F.3d 224, 231–32 (2nd Cir. 2014) (emphasis added). After all, the implied right of action under Title VI reaches no further than the Equal Protection Clause, *Alexander*, 532 U.S. at 280–81, and the Equal Protection Clause demands proof of a "racially discriminatory intent or purpose." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265 (1977); *Burton v. City of Bele Glade*, 178 F.3d 1175, 1202 (11th Cir. 1999) ("Accordingly, Title VI's protection extends no further than that already afforded under the Equal Protection Clause[.]"); *cf. McGugan*, 752 F.3d at 231 ("The term 'discrimination' is potentially confusing in the context of medical treatment.").

Throughout his Complaint, Holt attributes supposed knowledge to Defendants, generally. But Holt does not allege sufficient facts to show that Emory was aware that *his* eGFR calculation had persisted as inaccurate, much

13

less that Emory desired—on account of racial bias—for that inaccuracy to delay *his* wait-time accrual. To that end, the Supreme Court's principal decision on the federal pleading standard is instructive. *See Iqbal*, 556 U.S. at 682–83 ("[T]he complaint must contain facts plausibly showing that petitioners *purposefully* adopted a policy . . . *because* of . . . race, religion, or national origin. This the complaint fails to do." (emphasis added)). Like the allegations in *Iqbal*, Holt's fail too.

Finally, all that can be gleaned from the Complaint regarding Emory is that any discrepancy relating to Holt's eGFR score was only discovered *following* UNOS's January 2023 policy directing hospitals "to investigate which patients [were] eligible for a wait time adjustment, and to request said adjustment with UNOS[.]" Doc. 1 at ¶ 70. But even *then*, that sort of strained inference is still insufficient, since it only amounts to after-the-fact notice, which, by definition, cannot "plausibly establish" notice that discrimination previously occurred. *See K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1058 (8th Cir. 2017) ("the actual knowledge element requires . . . more than after-the-fact notice").

### 2.   *Holt does not plausibly allege deliberate indifference.*

Holt also fails to plausibly allege that Emory was deliberately *indifferent* to the alleged discrimination. Again, an entity "is not deliberately indifferent simply because the measures it takes to stop the . . . discrimination ultimately

14

are ineffective," the entity's response must be clearly unreasonable, *Adams*, 80 F.4th at 1270, amounting to "an official decision . . . not to remedy the violation." *Gebser*, 524 U.S. at 290. Here, even following the post-hoc notice that Holt alludes to, Holt does not allege facts to suggest that Emory deliberately delayed notifying him of a wait-time adjustment, upon its discovery, and then processing that adjustment. *See Adams*, 80 F.4th at 1270 (holding eight-month delay in adopting policy to guard against potential discrimination not "clearly unreasonable" as a matter of law).

## II.   Holt does not state a claim against Emory for breach of fiduciary duty under state law.

In Count II, Holt asserts a common law claim for breach of fiduciary duty. Under Georgia law, Holt must establish, among other things, that Emory owed Holt a fiduciary duty as his fiduciary. *UWork.com, Inc. v. Paragon Tech., Inc.*, 321 Ga. App. 584, 594 (2013); *see Cottrell v. Smith*, 299 Ga. 517, 531 (2016); *accord King v. King*, 69 F.4th 738, 743 (11th Cir. 2023). Here, Holt cannot establish the existence of a fiduciary relationship justifying the imposition of a fiduciary duty.

The question of whether a fiduciary relationship exists between the parties is generally a question of law. *See Dept. of Labor v. McConnell*, 305 Ga. 812, 817–18 (2019). Georgia Code section 23-2-58 enumerates certain relationships that are fiduciary relationships as a matter of law. O.C.G.A. § 23-

15

2-58; *see King v. King*, 316 Ga. 354, 357 (2023). But the relationship between Emory and Holt did not constitute any of those relationships: Emory was not Holt's guardian, his trustee, nor his business partner. Emory operated a hospital where Holt sought treatment.

Furthermore, Holt cannot cite any Georgia authority recognizing a fiduciary relationship between a Georgia hospital and its patient because none exists. *See Cox v. Athens Reg'l Med. Ctr.*, 279 Ga. App. 586, 593 (2006) ("appellants cite no Georgia cases, citing [O.C.G.A. § 23-2-58] or otherwise, that recognize a fiduciary relationship between a hospital and a patient"). Nor can a fiduciary relationship arise between Emory and Holt merely because Holt alleges that he "personally reposed trust and confidence" in Emory with respect to his medical care. *Morrell v. Wellstar Health Sys., Inc.*, 280 Ga. App. 1, 7 (2006). While *physicians* can "owe a fiduciary duty to their patients with respect to the care given," *Cox*, 279 Ga. at 593 n.14, that does not mean *hospitals* are likewise fiduciaries to their patients. *Valley Health Sys., LLC v. Murray*, 544 P.3d 904, 909–10 (Nev. 2024) (surveying cases nationwide and concluding "[n]o authority supports a broad finding that hospitals owe patients a fiduciary duty"). Because Holt does not plausibly allege the existence of a fiduciary duty, his breach of fiduciary duty claim must be dismissed.

## III. Holt's claims are barred by the statute of limitations.

Even if Holt had plausibly alleged a federal or state law claim against Emory, his claims would still be barred by the statute of limitations. Because Holt's claims accrued more than two years ago, the Title VI claim is barred by O.C.G.A. § 9-3-33 and the state law claim is barred by O.C.G.A. § 9-3-71.

### A. The Title VI claim accrued more than two years ago, and thus it is barred by O.C.G.A. § 9-3-33.

Title VI does not contain a limitations period. In such circumstances, a federal court adopts the most analogous state-law limitations period as a matter of federal law under 42 U.S.C. §1988. *See Wilson v. Garcia*, 471 U.S. 261, 267 (1985); *Owens v. Okure*, 488 U.S. 235, 249–50 (1989); *see also Silva v. Baptist Health S. Fla., Inc.,* 856 F.3d 824, 841 (11th Cir. 2017). Here, O.C.G.A. § 9-3-33, Georgia's general two-year limitations period for personal injury actions controls. *Rozar v. Mullis*, 85 F.3d 556, 561 (11th Cir. 1996); *Zadoorian v. Gwinnett Tech. Coll.*, 2024 WL 1554362 (11th Cir. Apr. 10, 2024); *see also M.H.D. v. Westminster Schools*, 172 F.3d 797, 803 (11th Cir. 1999) (holding O.C.G.A. § 9-3-33 governs Title IX claims as well).[18]

---

[18] The catchall four-year limitations period created by 28 U.S.C. § 1658 does not apply here because Title VI's implied cause of action was not "made possible by a post-1990 enactment." *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004). Thus, "[f]or actions authorized by previously-enacted statutes, including Title VI, courts continue to borrow the limitations period from state law." *Monroe v. Columbia Coll. Chicago*, 990 F.3d 1098, 1099 n.1 (7th Cir. 2021).

    *1.    The Court should not apply the discovery rule.*

While state law supplies the limitations period, federal law governs the accrual analysis. *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *Rozar*, 85 F.3d at 561. And under the "standard rule" of accrual, a claim accrues when the plaintiff has a complete and present cause of action. *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (quoting *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferber Cor. of California*, 522 U.S. 192, 201 (1997)); *Gabelli v. SEC*, 568 U.S. 442, 448 (2013). "[T]hat is, when 'the plaintiff can file suit and obtain relief." *Wallace*, 549 U.S. at 388 (quoting *Bay Area Laundry*, 522 U.S. at 201).

Although this is "presumptively" the rule for purposes of accrual under federal law, *McDonough v. Smith*, 588 U.S. 109, 115 (2019), in *Rozar* the Eleventh Circuit mistakenly endorsed a discovery rule under Title VI. *See Rozar*, 85 F.3d at 561–62. And under that rule "the statute of limitations begins to run on a claim when 'the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'" *Foudy v. Indian River Cnty. Sheriff's Off.*, 845 F.3d 1117, 1122–23 (11th Cir. 2017) (quoting *Rozar*, 85 F.3d at 561-62).

But the Supreme Court has rarely, if ever, endorsed this approach; and it never has done so for the civil rights statutes. *TRW, Inc. v. Andrews*, 534 U.S. 19, 37 (2001) (Scalia, J., concurring in judgment); *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) ("This expansive approach to the discovery rule is a 'bad wine

18

of recent vintage.'" (quoting *TRW, Inc.*, 534 U.S. at 37). Indeed, the Eleventh Circuit has since questioned its own practice of doing so, even rejecting the discovery rule under Title IX. *See Foudy*, 845 F.3d at 1123; *see also M.H.D.*, 172 F.3d at 804 ("We disagree that the discovery rule applies in this case."). Thus, were this Court freshly deciding the issue free from *Rozar*'s holding, subsequent precedent makes clear that adopting a discovery rule under Title VI would be inappropriate, and Holt's claim would have accrued on December 6, 2016, under the occurrence rule. *See Foudy*, 845 F.3d at 11223.[19]

> 2. *The Title VI claim accrued in December 2016.*

Even under the discovery rule, however, Holt's claim is still time-barred. As the Eleventh Circuit has noted, despite that "many" cases "profess adherence to the discovery rule, the constructive knowledge element can cause it to function as an occurrence rule[.]" *Foudy*, 845 F.3d at 1123. Generally, this means constructive knowledge is imputed to the plaintiff at the time of the discriminatory act itself. *Hillcrest Prop., LLC v. Pasco Cnty.*, 754 F.3d 1279, 1283 (11th Cir. 2014). Thus, when analyzing claims of discrimination, "the proper focus is on the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful." *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (emphasis original). In other words, the accrual period is not extended

---

[19] Emory recognizes that *Rozar* binds the Court on the discovery rule issue, but it respectfully presses the above to preserve a challenge to *Rozar* on appeal.

simply because some later act "gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination." *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980) (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 557 (1980)).

Here, Holt's Title VI claim accrued in December 2016 when, as Holt alleges, he was wrongfully denied the accrual of wait-time. As Holt acknowledges, critiques of the race-conscious coefficient were circulating among the medical research community as far back as 2011, well before it allegedly injured him. Doc. 1 at ¶ 60. In fact, the article Holt cites in Paragraph 59 of the Complaint plainly explains that, the 2009 CKD-EPI equation—the "widely used" equation for estimating GFR levels—"incoporat[ed] coefficients that adjust individuals' [eGFR] based on Black race or female sex."[20] Furthermore, as previously noted, the 2009 CKD-EPI did not invent the race- and sex-conscious coefficients out of whole-cloth. Rather, their incorporation into the 2009 CKD-EPI equation was based on predecessor equations and prior studies "to account for differences in serum creatinine observed" in the studies.[21] All of this is to say, nothing prevented Holt from discovering the nature and source of his alleged injury on December 6, 2016, and thus, even

---

[20] L. Ebony Boulware, *et al.*, *Systematic Kidney Transplant Inequities for Black Individuals: Examining the Contribution of Racialized Kidney Function Estimating Equations*, JAMA Network (Jan. 14, 2021), at 1.

[21] *Id.*

under the discovery rule Holt's claim still accrued on that date. *See Rozar*, 85 F.3d at 563.

> 3.   *The Title VI claim accrued at the latest in September 2021.*

Even if this Court were to suspect that Holt's claim accrued at some point after December 2016, the Court would still have to conclude that the Title VI claim accrued by September 2021—still more than two years ago.

On June 29, 2018, Holt alleges that he was eventually added to a waitlist at the Pittsburgh VA hospital. Doc. 1 at ¶ 75. But he does not allege why he could not have discovered the alleged discrimination that had occurred between December 2016 and June 2018. In April 2020, Holt alleges that he began receiving regular dialysis treatment. Doc. 1 at ¶ 6. While acknowledging this triggered his ability to receive wait-time accrual, Holt does not allege any facts as to why he was prevented from discovering the alleged discrimination between June 2018 and April 2020. Over the course of 2020, a national conversation surrounding eGFR calculations emerged. Beyond the medical community, debates also occurred in the halls of Congress. Yet, Holt still does not allege any facts as to why he was prevented from discovering the alleged discrimination even by December 2020.

By March of 2021 and over the ensuing year, not only had the National Kidney Foundation declared its major policy initiative, but the OPTN announced that it, too, had created a taskforce concerning the race-conscious

coefficient in eGFR formulas. Detailed reports were published. Official notice and public comment occurred through the end of 2021. Yet, Holt alleges no facts whatsoever justifying his inability to discover the alleged discrimination by the end of 2021. Given the above, the Court cannot conclude that constructive notice of the alleged discrimination did not arise sometime before the end of 2021. *See Rozar*, 85 F.3d at 562. So Holt's Title VI claim is barred.

**B.    The breach of fiduciary duty claim is barred by the statute of limitations and repose periods provided in O.C.G.A. § 9 3-71.**

Holt's claim for breach of fiduciary duty is governed by a different statute of limitations, O.C.G.A. § 9-3-71. But the result is still the same: Holt's state law claim is time-barred under the two-year statute of limitations and the five-year statute of repose. *See* O.C.G.A. § 9-3-71(a)–(b).

*1.    The breach of fiduciary duty claim sounds in medical malpractice.*

Though Holt designates the state law claim as one for breach of fiduciary duty, his claim is actually one for medical malpractice under Georgia law, and thus it is governed by O.C.G.A. § 9-3-71. A claim for medical malpractice is "any claim for damages . . . arising out of . . . [h]ealth, medical, . . . or surgical service, diagnosis, prescription, treatment, or care rendered by a [medical professional]" or by a "public or private hospital." O.C.G.A. § 9-3-70(1)–(2). Such claims are governed by O.C.G.A. § 9-3-71's two-year limitations period, and its five-year repose period.

Although Georgia law recognizes "a claim for breach of fiduciary duties—distinct from a claim of professional malpractice," where the claim "goes to the propriety of a professional decision" relating to medical care or treatment, then "that claim sounds in medical malpractice." *Johnson v. Jones*, 327 Ga. App. 371, 375 (2014) (quotation omitted). Substance controls over nomenclature. *Bradway v. American Nat. Red Cross*, 263 Ga. 19, 21–22 (1993). Thus, for example, in *Stafford-Fox v. Jenkins*, 282 Ga. App. 667, 671 (2006), the court held that a breach of fiduciary duty claim, which alleged that the medical providers misdiagnosed the patient's condition, merely "duplicated the medical malpractice claims," and it was thus governed by O.C.G.A. § 9-3-71; *see also Johnson*, 327 Ga. App. at 375 (similar). The same is true for Holt's claim. Holt's allegations are those of misdiagnosis, so his state law claim is one for medical malpractice.

> 2.   *The claim accrued more than two years ago.*

Georgia adheres to the same sort of accrual rule as the default federal accrual rule. A cause of action accrues "when the plaintiff could first have maintained [the] action to a successful result." *Kaminer v. Canas*, 282 Ga. 830, 833 (2007) (quotation omitted). Thus, for medical malpractice claims, the claim accrues on the date "an injury . . . arising from a negligent or wrongful act or omission occurred." O.C.G.A. § 9-3-71(a); *see Kaminer*, 282 Ga. at 832. "In most cases of negligent treatment and in most cases of misdiagnosis, the statute of

limitation for medical malpractice will begin running at the time of the treatment or misdiagnosis. That is the time that the injury generally occurs." *McCord v. Lee*, 286 Ga. 179, 180 (2009). As discussed above, that means Holt's claim accrued in December 2016. So, the claim is barred by the statute of limitations, as well as the five-year statute of repose. *Johnson*, 327 Ga. App. at 374–76 (concluding breach of fiduciary duty claim was instead medical malpractice claim and barred by statute of repose); O.C.G.A. § 9-3-71(a)–(b).

## IV. The Court should dismiss the Title VI claim insofar as it seeks impermissible damages.

Holt appears to claim compensatory damages under Title VI in the form of general damages for "personal injuries," "pain and suffering," and "emotional distress," as well as punitive damages. *See* Doc. 1 ¶ 94 & at 26 (prayer for relief). The Court should dismiss Holt's Title VI claim to the extent he seeks these impermissible damages.

First, punitive damages cannot be recovered under Title VI's implied right of action. *Barnes v. Gorman*, 536 U.S. 181, 188 (2002). Second, successful plaintiffs likewise cannot recover general damages for pain and suffering or emotional distress. *Posey v. Atlanta Pub. Sch.*, No. 1:23-CV-341-MLB, 2024 WL 1223474, at *6 (N.D. Ga. Mar. 21, 2024); *see Pennington v. Flora Cmty. Unit Sch. Dist. No. 35*, No. 3:20-CV-11-MAB, 2023 WL 348320, at *2 (S.D. Ill. Jan. 20, 2023); *see also Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212,

218–20 (2022); *Doe ex rel. Doe v. City of Pawtucket*, 633 F.Supp.3d 583, 588 (D.R.I. 2022). Thus, the Court should dismiss the Title VI claim, to the extent Holt seeks these impermissible damages. *Posey*, 2024 WL 1223474, at *6 (dismissing Title VI claim "to the extent it seeks damages for pain and suffering")

## CONCLUSION

The Court should GRANT Defendant Emory Healthcare, Inc.'s Motion to Dismiss, and DISMISS Plaintiff Cleveland Holt's Complaint with prejudice.

## LOCAL RULE 7.1D CERTIFICATE

I certify that this document was prepared using Century Schoolbook 13-point font.

Respectfully submitted: June 4, 2024.

**HALL BOOTH SMITH, P.C.**

191 Peachtree Street NE
Suite 2900
Atlanta, GA  30303
404-954-5000 / 404-954-5020 Fax
jhall@hallboothsmith.com
jsaxby@hallboothsmith.com
pcunningham@hallboothsmith.com

*/s/ Jeffery Randolph Saxby*
JOHN E. HALL, JR.
Georgia Bar No. 319090
JEFFERY RANDOLPH SAXBY
Georgia Bar No. 623423
PEARSON K. CUNNINGHAM
Georgia Bar No. 391024

*Attorneys for Defendant Emory Healthcare, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that I served a true and correct copy of the foregoing **Brief in Support of Motion to Dismiss** upon all parties to this matter via the CM/ECF system which will automatically send electronic notifications to:

David N. Dreyer
Washington Dreyer & Assocs., LLC
david@washingtondreyer.com
260 Peachtree Street, Ste. 1600
Atlanta, GA  30303
david@washingtondreyer.com
*Attorney for Plaintiff*

Michael A. Caplan
Michael L. Eber
Caplan Cobb LLC
75 Fourteenth Street NE
Suite 2700
Atlanta, GA  30309
mcaplan@caplancobb.com
meber@caplancobb.com
*Attorneys for Defendant United Network for Organ Sharing*

Patrick C. Fagan
Kayla B. Polonsky
Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 West Peachtree Street NW
Atlanta, GA  30309
fagan@bmelaw.com
polonsky@bmelaw.com
*Attorneys for Defendant Board of Trustees of the University of Alabama*

Mark E. Anderson
McGuireWoods LLP
501 Fayetteville Street
Suite 500
Raleigh, NC  27601
manderson@mcguirewoods.com

Rebecca M. Borkovich
McGuireWoods LLP
1075 Peachtree Street
Suite 3500
Atlanta, GA  30309
rborkovich@mcguirewoods.com
*Attorneys for Duke University Health System, Inc.*

June 4, 2024

**HALL BOOTH SMITH, P.C.**

*/s/ Jeffery Randolph Saxby*
JOHN E. HALL, JR.
191 Peachtree Street NE              Georgia Bar No. 319090
Suite 2900                           JEFFERY RANDOLPH SAXBY
Atlanta, GA  30303                   Georgia Bar No. 623423
404-954-5000 / 404-954-5020 Fax      PEARSON K. CUNNINGHAM
jhall@hallboothsmith.com             Georgia Bar No. 391024
jsaxby@hallboothsmith.com            *Attorneys for Defendant Emory*
pcunningham@hallboothsmith.com       *Healthcare, Inc.*